IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


NICOLE PETTIFORD and            )
ANTHONY PETTIFORD,              )
                                )
        Plaintiffs,             )
                                )
    v.                          )        Civil Action No.: 1:06cv1057
                                )
CITY OF GREENSBORO,             )
                                )
        Defendant.              )


**MEMORANDUM OPINION AND ORDER**

SCHROEDER, District Judge

        Plaintiffs Nicole and Anthony Pettiford, husband and wife
("Plaintiffs"), seek civil damages based on alleged misconduct
arising from an investigation by the Greensboro Police Department
("GSO PD"), which is operated and governed by Defendant, City of
Greensboro (the "City"). (Doc. 12.) Before the Court are
Defendant's Motion and Renewed Motion to Dismiss pursuant to
Federal Rules of Civil Procedure 12(b)(1), (b)(2), (b)(6), and
(b)(7) (Docs. 9 & 15) (referred to hereafter simply as the "Motion
to Dismiss") and several cross motions relating to the City's
proposed evidentiary support for its Motion to Dismiss. (Docs. 14,
22, 23 & 25.) For the reasons below, the Motion to Dismiss will be
granted in part and denied in part, and the remaining motions will
be addressed in turn.

## I.  FACTUAL BACKGROUND

The following allegations from the Amended Complaint are viewed in the light most favorable to Plaintiffs for purposes of these motions.  <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (2007); <u>Ibarra v. United States</u>, 120 F.3d 472, 474 (4th Cir. 1997).

On November 9, 2004, Plaintiff Nicole Pettiford exited a fast food restaurant in Greensboro around dinner time and, before entering her car where her children were waiting, was met by GSO PD Detective Scott Sanders.  (Doc. 12 ¶¶ 10-11.)  Detective Sanders displayed the insignia and badges of the GSO PD and ordered Ms. Pettiford to accompany him for questioning.  (<u>Id.</u> ¶ 11.)  At Detective Sanders' insistence, Ms. Pettiford drove to her husband's place of employment, where she left her car and, along with a female GSO PD officer, rode with her children to the home of Ms. Pettiford's sister, where she left her children.  (<u>Id.</u> ¶¶ 12-13.) A GSO PD officer then drove Ms. Pettiford to the Residence Inn hotel in Greensboro, where Ms. Pettiford was questioned by several GSO PD officers for six hours about her knowledge of the activities of "certain black officers" of the GSO PD.[1]  (<u>Id.</u> ¶¶ 14-15.)

---

[1]  The Amended Complaint does not elaborate on the Plaintiffs' role, if any, in the activities underlying the alleged GSO PD investigation or the nature of their knowledge or involvement with the officers allegedly under investigation.

During this six-hour period, Ms. Pettiford alleges she repeatedly requested to leave, expressed concern for her children, was denied permission to answer her cell phone when her husband called several times to inquire about her whereabouts, and was told she would lose her children and spend forty years in federal prison. (Id. ¶¶ 16-19.) Around midnight, Detective Sanders and the other GSO PD officers permitted Ms. Pettiford to leave on the condition that she allow them to search her home, her car and Plaintiff Anthony Pettiford's car, which she did. (Id. ¶ 23.) Ms. Pettiford maintains that the GSO PD officers acted violently and verbally abused her during the search, ultimately seizing several financial records belonging to the Plaintiffs. (Id. ¶¶ 26-27.) Mr. Pettiford, who arrived home while the female GSO PD officer was still present, never consented to the search of his home or his car. (Id. ¶ 28.)

Beginning the next day, Ms. Pettiford claims, Detective Sanders embarked on a campaign to "harass" her by (1) calling her on the telephone; (2) informing her employer that she would be sent to prison, thus "ruining" her reputation and ability to perform her job; (3) contacting her mother to question her and to inform her that her daughter was "in trouble"; (4) notifying her bank and "manipulating its employees so that plaintiff Nicole Pettiford would incur bad check charges"; and (5) contacting the Department

3

of Motor Vehicles "to arrange a frivolous hearing." (Id. ¶ 30.) Plaintiffs claim that at no time did Detective Sanders or the GSO PD ever inform them of any charges against them, nor have charges ever been filed against them. (Id. ¶¶ 14, 17, 20, 25, 29.) Plaintiffs further claim that, as a result of all this, Ms. Pettiford lost her job, and collectively they suffer a variety of emotional injuries from anxiety to physical sickness, as well as lost income. (Id. ¶¶ 30, 38, 39, 40, 45.)

Plaintiffs filed this action in the Superior Court of Guilford County, North Carolina, seeking recovery under the U.S. Constitution, pursuant to 42 U.S.C. § 1983, the North Carolina Constitution, and the common law of negligence. (Doc. 4.) The City removed this action on the grounds of federal question jurisdiction. (Doc. 1.) In lieu of answering, the City filed a Motion to Dismiss and, after Plaintiffs' Amended Complaint, a Supplemental Motion to Dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(2), (b)(6), and (b)(7) (Docs. 9 & 15), which has prompted several motions related to the City's proposed evidentiary support.[2]

---

[2] After Plaintiffs filed an Amended Complaint (Doc. 12), the City responded with a Supplemental Motion to Dismiss (Doc. 15) and a Suggestion of Subsequently Decided Authority (Doc. 32). The parties also spar over affidavits filed with the Motion to Dismiss and Supplemental Motion to Dismiss. While Plaintiffs have asked the court to strike the affidavits (Docs. 14 & 25), the City has requested *in camera* review of audiotape recordings allegedly related to the investigation of Plaintiffs (Doc. 22) and has sought a stay if the court

4

## II. ANALYSIS

### A.   Joinder under Rule 12(b)(7) and Rule 19

The City contends that throughout its investigation the GSO PD was acting at the direction of the Assistant United States Attorney and the United States Attorney's Office for the Middle District of North Carolina ("Federal Parties"). (Doc. 10 at 8; Doc. 21 at 11-12.) The City argues that the Federal Parties enjoy sovereign and prosecutorial immunities from suit and are necessary and indispensable parties because they may have information to support the City's defense that it benefits derivatively from these federal immunities. (Doc. 10 at 9-10, 12; Doc. 21 at 12.) Plaintiffs' failure to join them to the action, the City argues, requires dismissal, under Rules 12(b)(7) and 19, Fed. R. Civ. P. (Doc. 9 ¶ 3; Doc. 10 at 12, 13, 16; Doc. 21 at 13.)

Rule 19, as amended in 2007, sets forth a two-part inquiry for determining whether a court must dismiss an action for failure to join an indispensable party. First, a court must determine whether the person is "required" under Rule 19(a). <u>Am. Gen. Life & Accident Ins. Co. v. Wood</u>, 429 F.3d 83, 92 (4th Cir. 1995). If the absent person is a required party, the court must order his joinder and the action may continue. <u>RPR & Assocs. v. O'Brien/Atkins Assocs.</u>, 921 F. Supp. 1457, 1463 (M.D.N.C. 1995). Second, if

grants Plaintiffs' motions to strike the various affidavits. (Doc. 23).

joinder is required but is not feasible, the court must determine whether the person is "indispensable" under Rule 19(b) such that the action must be dismissed. Wood, 429 F.3d at 92; RPR & Assocs., 921 F. Supp. at 1463. Dismissal for non-joinder is a remedy employed extremely reluctantly, "only when the defect cannot be cured and serious prejudice or inefficiency will result." RPR & Assocs., 921 F. Supp. at 1463 (citing Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 118 (1968)). The burden of proof is on the moving party to demonstrate that the absent person must be joined to facilitate a just adjudication. Wood, 429 F.3d at 92.

### 1.  Required Parties

On a motion to dismiss under Rule 12(b)(7), the court initially must determine if it should join the absent person as a party under Rule 19(a). RPR & Assocs., 921 F. Supp. at 1463. Rule 19(a)(1) requires joinder when:

> (A)  in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B)  that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i)  as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double,

6

>                multiple,   or   otherwise   inconsistent
>                obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  Thus, Rule 19(a)(1)(A) focuses on the

relief to existing parties, whereas Rule 19(a)(1)(B) focuses on the

interest of the absent person and the effect, if any, his absence

would have on either himself or the existing parties.  Schweyer

Import-Schnittholz GmbH v. Genesis Capital Fund, L.P., 220 F.R.D.

582, 586 (S.D. Iowa 2004).

### a.   Complete Relief

The City argues first that the Federal Parties' absence will

preclude complete relief among the existing parties, pursuant to

Rule 19(a)(1)(A).  (Doc. 10 at 8-11.)  The City does not assert

that Plaintiffs cannot obtain complete relief from it.  Rather, it

asserts that the Federal Parties are necessary so the City can

adequately present proposed defenses of derivative sovereign and/or

prosecutorial immunities.  (Id. at 9-10; Doc. 21 at 12.)  Absent

the Federal Parties, the City contends, it "could be forced to

defend actions that are not its responsibility and, moreover, would

be prejudiced in that defense." (Doc. 10 at 8; Doc. 21 at 12.)

"Complete relief" is any relief that "will effectively and

completely adjudicate the dispute."  7 Charles Alan Wright, Arthur

R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1604

(3d ed. 2001).  Commonly read, this definition encompasses

affirmative relief.  E.g., Health Care Indem., Inc. v. King, No.

7

2:05-0913, 2006 U.S. Dist. LEXIS 70783, at *27 (S.D. W. Va. Sept. 25, 2006) (finding complete relief available between existing parties because codefendants were not necessary for court to enter declaratory judgment); Beckham v. Grand Affair of N.C., Inc., 671 F. Supp. 415, 420-21 (W.D.N.C. 1987) (finding City of Charlotte police officers and department were not necessary parties because plaintiff can obtain complete relief without them through an award of actual and punitive damages, reasonable attorney's fees, costs, and other appropriate relief). Thus, if "complete relief" were so limited, the City's request for dismissal for failure to name the Federal Parties would fail.

Nevertheless, there is no precise formula for determining compulsory joinder under Rule 19. Because the ultimate goal is to achieve complete and effective relief, among other things,[3] a few courts have held that the term "complete relief" incorporates the presentation of defenses.[4] E.g., Chiasson v. Karl Storz Endoscopy-

---

[3] Compulsory joinder under Rule 19(a) requires a higher standard than permissive joinder under Rule 20's "transaction or occurrence" test. Fed. R. Civ. P. 20.

[4] At oral argument, the City was unaware of any Fourth Circuit precedent that permits consideration of defenses in determining "complete relief." (Tr. of Oral Argument at 26.) Of the courts that have addressed this issue, however, most conclude that the joinder of additional parties is not necessary to afford complete relief under Rule 19(a). E.g., SEC v. Bilzerian, 378 F.3d 1100, 1108 (D.C. Cir. 2004) (holding that the additional party's presence was not necessary for a defendant to raise certain defenses); Gateco, Inc. v. Safeco Ins. Co. of Am., No. 05-2869, 2006 U.S. Dist. LEXIS 23386, at *11 (E.D. Pa. Apr. 26, 2006) (holding that the joinder of another party was not required to

8

Am., Inc., No. 93-1565, 1994 U.S. Dist. LEXIS 13821, at *9 (E.D. La. Sept. 29, 1994) (dismissing an action against all defendants "[b]ecause the issues of liability are so intertwined, the absence of either or both nondiverse defendants would preclude complete relief as between the original parties"). Thus, the question at this stage is: assuming, without deciding, that "complete relief" incorporates the City's contemplated derivative defenses based on federal immunities, is the City's motion merited?

As an initial observation, the City's argument fails if either (1) the City cannot benefit from the derivative federal immunities; or (2) even if it can, the presence of the Federal Parties is not "required" in order for the City to adequately present its proposed defense. Put another way, even if the City could benefit derivatively from the federal government's immunities (discussed more fully in Section C below), it must nevertheless demonstrate sufficient need to *require* the addition of the Federal Parties.

---

present contractual defenses); Behrens v. Donnelly, 236 F.R.D. 509, 514-515, 514 n.2 (D. Haw. 2006) (holding that joinder is not required to argue that a joint tortfeasor alone is liable); Evergreen Marine Corp. v. Welgrow Int'l Inc., 942 F. Supp. 201, 206 (S.D.N.Y. 1996) (holding that the absence of the additional party would not preclude the presentation of any legitimate defenses, even though the additional party might alleviate potential difficulties of proof); List v. Monco, No. 91 C 537, 1992 U.S. Dist. LEXIS 20572, at *11 (N.D. Ill. Jan. 25, 1993) (holding that presence of another defendant was not required to present a defense).

9

**(1) Joinder Based on Derivative Federal Sovereign Immunity**

The City relies principally on one case, <u>Nichols v. Rysavy</u>, 809 F.2d 1317 (8th Cir. 1987), to argue that the Federal Parties' sovereign immunity renders them indispensable parties and warrants dismissal of the action. (Doc. 10 at 8-9.) In <u>Nichols</u>, descendants of Sioux Indians claimed to be heirs to certain real property. <u>Nichols</u>, 809 F.2d at 1320, 1323. The United States had held this real property, initially as trustee, before deeding it in fee simple to Sioux Indians between 1916 and 1921 under a federal law designed to assimilate Indians into American culture. <u>Id.</u> at 1320. After their forebears lost title to these properties through swindlers and illegal taxes, <u>id.</u> at 1322-23, the descendants sued, seeking recognition that the federal government still held the property in trust (thus preserving the heirs' rights). <u>Id.</u> at 1320. The court found that the claims against the United States were time-barred and then examined whether the government was an indispensable party necessitating dismissal of the actions under Rule 19. <u>Id.</u> at 1331-34. Applying factors set forth by the Supreme Court in <u>Provident Tradesmens Bank & Trust Co. v. Patterson</u>, 390 U.S. 102, 109-11 (1968), the court concluded that the United States was necessary and indispensable because, among other reasons, the relief sought — reinstatement of the government as trustee over the lands at issue — depended *entirely* on the

10

actions of the federal government in granting the fee simple patents and threatened the entire United States title system. <u>Nichols</u>, 809 F.2d at 1333. Put another way, if the federal government had acted lawfully, the actions would have to be dismissed — a process the court called trying the government's liability "behind its back." <u>Id.</u>

To buttress its argument for joinder of the Federal Parties, the City offers several affidavits that quote from taped conversations between various individuals — including an Assistant U.S. Attorney for the Middle District of North Carolina, GSO PD Detective Sanders, and Ms. Pettiford — involving the Federal Parties' alleged role in the investigation of Plaintiffs. (Docs. 11, 16 & 20.) For present purposes, the affidavits would show that the Assistant U.S. Attorney was present for a portion of the November 9, 2004, interview of Ms. Pettiford, told her she was under federal investigation, and turned the interview over to GSO PD Detective Scott Sanders, who told her he was acting as an agent of the U.S. Attorney's Office. (Doc. 9 ¶ 7; Doc. 11 ¶¶ 7-9; Doc. 16 ¶ 9; Doc. 20 ¶ 5.) The Assistant U.S. Attorney also told Detective Sanders that he "was responsible for and had directed the federal investigation of Ms. Pettiford" and that "anything you did in this case, you did at my direction." (Doc. 11 ¶¶ 14, 15; <u>see</u> Doc. 15 ¶ 7; Doc. 16 ¶¶ 5, 9.) Ms. Pettiford also admitted that

11

the Assistant U.S. Attorney had been present at this meeting, and that she had subsequently placed telephone calls to him, directly or through counsel, to inquire as to the status of the investigation into her alleged activities. (Doc. 11 ¶¶ 7, 9-10, 13; Doc. 20 ¶¶ 5, 7-8.) The City argues that this evidence demonstrates it was acting at the direction of the Federal Parties. (Doc. 10 at 7-10; Doc. 21 at 9-13; Tr. of Oral Argument at 2-3, 7-13, 18-21.)

Plaintiffs object to, and move to strike, three of the affidavits — those of GSO PD Detective Jeff Flinchum (Doc. 11), GSO PD Detective L.A. Holder (Doc. 20) and GSO PD Captain Gary Hastings (Doc. 16) — on multiple evidentiary grounds (Docs. 14 & 25). Whether the affidavits suffer from evidentiary deficiencies, a topic addressed in Section C of this opinion, need not be decided here. For, even accepting the statements in the affidavits as true for the sake of argument, the City's motion fails.

First, the City mis-perceives its burden. The test under Rule 19(a)(1)(A) is not whether the Federal Parties may have evidence that might assist the City. Rather, it is whether the City lacks such evidence, or access to it, that the court "cannot" afford complete relief as to the City's defense without the presence of the Federal Parties. Nowhere in the City's affidavits does it articulate why no employee of the GSO PD — particularly those the

12

City claims were intimately involved, including Detective Sanders — can testify as to the nature of the direction received from the Federal Parties in its investigation of Plaintiffs. Indeed, the fact that the City offers such evidence now undercuts its Rule 19(a)(1)(A) argument. The City concedes as much, arguing only that its defense of derivative federal immunity "*may* depend on facts not in [its] possession." (Doc. 10 at 10 (emphasis added).)

That the Federal Parties may have important information does not negate the fact that such information may also be available from other sources, including the City itself. Parties seeking to avail themselves of a derivative federal immunity regularly do so — often successfully, or at least sufficiently — by presenting their own evidence of the nature of the relationship that gives rise to immunity. See, e.g., Richland-Lexington Airport Dist. v. Atlas Props., Inc., 854 F. Supp. 400, 423 (D.S.C. 1994) (relying on affidavits); *In re* World Trade Ctr. Disaster Site Litig., 456 F. Supp. 2d 520, 564-65 (S.D.N.Y. 2006) (relying on depositions and other exhibits), aff'd in part and appeal dismissed in part, 521 F.3d 169 (2d Cir. 2008). In government contractor defense litigation, for example, the federal government, by virtue of its sovereign immunity, is not a party, yet the defense can be presented without it. See, e.g., Boyle v. United Techs. Corp., 487 U.S. 500, 502 (1988) (suit against helicopter manufacturer);

13

<u>Kleeman v. McDonnell Douglas Corp.</u>, 890 F.2d 698, 700 (4th Cir. 1989) (suit against aircraft designer and manufacturer); <u>Szigedi v. Ensign-Bickford Co.</u>, No. 1:00CV00836, 2002 U.S. Dist. LEXIS 26239, at *2 (M.D.N.C. July 15, 2002) (suit against hand grenade manufacturer), <u>adopted by</u> 2003 U.S. Dist. LEXIS 7342, *2 (M.D.N.C. Apr. 10, 2003).[5]

Second, in the present case it cannot be said, as in <u>Nichols</u>, that on the current record the outcome of Plaintiffs' claims depends entirely on the lawfulness of the Federal Parties' actions. Contrary to the City's assertion (Doc. 10 at 8-9; Tr. of Oral Argument at 20), the federal investigation into drug and money laundering, which Ms. Pettiford is alleged to have "messed up," is not necessarily at issue in adjudicating the conduct of the GSO PD in investigating Plaintiffs. Rather, as explained in Section C below, even assuming the City can avail itself of federal immunities derivatively, the City's liability may depend, at least in part, on the *nature and specificity* (or lack thereof) of its agreement with the Federal Parties as to the latter's directives and on the *actions of the GSO PD* in carrying them out — factors that may not necessitate questioning the validity of the Federal Parties' actions. Further, the Amended Complaint alleges that, in

---

[5]   To the extent difficulties of proof arise, they point to the wisdom of having a formal, written agreement between the municipality and the federal government, as noted in Section C <u>infra</u>.

addition to Detective Sanders, at least three other GSO PD officers participated in the investigation involving Plaintiffs. (Doc. 12 ¶ 15). The City's proffered evidence does not address the role of these other alleged actors, rendering reliance on a claimed federal immunity to protect it even more attenuated on the present record.

As the court in <u>Nichols</u> observed, these determinations can only be made in the context of particular facts in the specific litigation. <u>Nichols</u>, 809 F.2d at 1332 (citing Provident Tradesmens, 390 U.S. at 118-19). The proposed evidentiary showing does not offer a sufficient basis upon which to mandate at this stage that the lawsuit can proceed only with the presence of the Federal Parties. Whether such a showing can be made on a more fully developed record remains to be determined.

### (2) Joinder Based on Derivative Federal Prosecutorial Immunity

The City also contends that it should benefit derivatively from the Federal Parties' prosecutorial immunity. (Doc. 10 at 10.) Although the City cites some case law that recognizes the existence of prosecutorial immunity generally (<u>id.</u> at 13), it cites no authority for the proposition that such immunity would, in any way, apply to constitutional claims against a municipality.

Prosecutors are absolutely immune from civil suits for damages under section 1983 for "the initiation and pursuit of a criminal prosecution." <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259, 269 (1993).

15

Although this absolute immunity extends to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom," <u>Imbler v. Pachtman</u>, 424 U.S. 409, 431 n.33 (1976), "[a] prosecutor's . . . investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." <u>Buckley</u>, 509 U.S. at 273. "When a prosecutor performs the investigative functions normally performed by a detective or police officer," the prosecutor is entitled only to the same qualified immunity already enjoyed by such law enforcement officials. <u>Id.</u> at 273, 276.

It is hard to conclude on this record that the City must be entitled to *absolute* prosecutorial immunity. First, the City seeks immunity, at least in part, for the investigative functions "normally performed by a detective or police officer." (Doc. 10 at 2-5.) These functions are subject, at best, to qualified immunity. <u>Buckley</u>, 509 U.S. at 273, 276. Second, the City has not explained why prosecutorial immunity would apply to non-prosecutors, such as Detective Sanders and the three other GSO PD officers.[6] Third, the record fails to demonstrate that such a defense (even if applicable

---

[6] Courts have extended prosecutorial immunity to non-prosecutors only on rare occasions when the non-prosecutor performs prosecutorial functions. <u>E.g.</u>, <u>Vosburg v. Dep't of Soc. Servs.</u>, 884 F.2d 133, 135, 137-38 (4th Cir. 1989) (granting absolute immunity to social workers in connection with their filing of a child removal petition in juvenile court).

16

to these facts) "cannot" be raised adequately without the presence of the Federal Parties under Rule 19(a).  The City has already conceded that the establishment of immunities, "especially in the case of prosecutorial immunity, *may* depend on facts not in [its] possession." (Doc. 10 at 10 (emphasis added).)  Fourth, the City has not shown that federal prosecutorial immunity could apply derivatively.  Fifth, applying the prosecutorial immunity doctrine wholesale to the City at this stage without a clearer record would be inconsistent with the rule that a municipality "may not assert the . . . [qualified immunity] of its officers or agents as a defense to liability under § 1983." <u>Owen v. City of Independence</u>, 445 U.S. 622, 638 (1980).

Therefore, just as the record presently does not demand joinder of the Federal Parties for the derivative sovereign immunity defense, it fails to do so on the prosecutorial immunity ground as well.

### b.   Inconsistent Obligations

The City argues that joinder of the Federal Parties is also necessary under Rule 19(a)(1)(B)(ii) "to prevent the possibility of . . . [it] being held liable for obligations that are inconsistent or do not belong to it." (Doc 10 at 10.)  This is so, the City argues, because the immunity of the Federal Parties would preclude the City from asserting claims for contribution or indemnity

17

against them if Plaintiffs prevail in this action.  (<u>Id.</u> at 10,
14.)

Contribution and indemnity are not legitimate bases for
joinder of potential joint tortfeasors under Rule 19.  <u>Temple v.
Synthes Corp.</u>, 498 U.S. 5, 8 (1990) (holding that joint tortfeasors
are not required parties); <u>United States v. County of Arlington</u>,
669 F.2d 925, 929 (4th Cir. 1982) (holding that "'[c]omplete'
relief refers to relief as between the persons already parties, not
as between a party and the absent person whose joinder is sought");
<u>Atl. Aero, Inc. v. Cessna Aircraft Co.</u>, 93 F.R.D. 333, 335
(M.D.N.C. 1981).  And, although the City presents this argument
under the rubric of "inconsistent obligations" pursuant to Rule
19(a)(1)(B)(ii), it actually appears to constitute another version
of the complete relief argument.  Whether and to what extent the
City's and the Federal Parties' conduct intersects, and to what
extent the City may bear responsibility therefore, remains to be
seen.  For these reasons, the City has not met its burden under
Rule 19(a) of demonstrating either that it "cannot" be accorded
complete relief absent the addition of the Federal Parties, or that
it will necessarily suffer inconsistent obligations in their
absence.[7]

_____

[7]  The City argues that some courts will dismiss "required" or
necessary parties without a showing that they are indispensable, citing
<u>Ricci v. State Bd. of Law Exam'rs</u>, 569 F.2d 782, 784 (3d Cir. 1978) and

## 2. Indispensable Parties

Because the Federal Parties are not demonstrably required parties under Rule 19(a), whether they are "indispensable" parties under Rule 19(b) would not affect the outcome. <u>Temple</u>, 498 U.S. at 8. Moreover, even if the Federal Parties were "required," the City fails to meet its burden under Rule 19(b).

The City stops short of conceding that the Federal Parties cannot be joined (Doc. 10 at 12 (stating "joinder may not be possible" and immunities "may bar such an action")), a necessary element of Rule 19(b), suggesting instead that their joinder is unlikely because they have available broad immunities from suit (<u>id.</u> at 12-13). These immunities include sovereign immunity, prosecutorial immunity, and immunity from constitutional torts. <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); <u>Imbler</u>, 424 U.S. at 431 (prosecutorial immunity); <u>Dukes v. United States</u>, No. 94-2365, 1995 U.S. App. LEXIS 28934, at *1 (4th Cir. Oct. 17, 1995) (affirming that prosecutorial immunity shields federal prosecutors from liability for damages); <u>Reinbold</u>

_____

<u>Green v. Cauthen</u>, 379 F. Supp. 361, 380 (D.S.C. 1974)). (Doc. 10 at 10-11.) Because the City has not demonstrated that the Federal Parties are required, this argument is moot. In the Fourth Circuit, moreover, courts have generally followed the two-step analysis set forth in Rule 19(a)-(b). This is because "[o]nly necessary persons may be indispensable, but not all necessary persons are indispensable." <u>Schlumberger Indus., Inc. v. Nat'l Sur. Corp.</u>, 36 F.3d 1274, 1285-86 (4th Cir. 1994).

19

<u>v. Evers</u>, 187 F.3d 348, 355 n.7 (4th Cir. 1999) ("the United States has not waived sovereign immunity in suits claiming constitutional torts"); <u>Pardo v. Fed. Corr. Inst.</u>, No. 94-6035, 1994 U.S. App. LEXIS 5372, at *3 (4th Cir. Mar. 23, 1994) ("suits against federal officials may not be brought under § 1983"); <u>Waller v. Butkovich</u>, 584 F. Supp. 909, 925 (M.D.N.C. 1984) (stating that the United States and federal officials in their official capacities are immune from liability for money damages, unless waived under the Federal Torts Claims Act). While the Federal Parties enjoy extensive immunities from suit, it cannot (and on this record, need not at this stage) be concluded that they are in fact immune from every possible action. For even if they were, under Rule 19(b)'s analysis, "in equity and good conscience, the action should proceed among the existing parties" at this stage. Fed. R. Civ. P. 19(b).

The first factor under Rule 19(b)(1) is whether a judgment might prejudice either the absent party or existing party. Fed. R. Civ. P. 19(b)(1). The City argues that the absence of the Federal Parties would deprive it of "facts necessary to its full defense," upon which the City depends, and that it "could face responsibility for liability that does not properly belong to it." (Doc. 10 at 14.) For the reasons set forth above, however, this has not been demonstrated. The City has only shown that the Federal Parties may have evidence that would be *helpful* to its defense, not that they

20

are the only such source. At this early stage, the City has failed to demonstrate that it is likely to face liability for actions "that do not belong to it," i.e., actions of the Federal Parties. As shown by the discussion in Section C _infra_, in the absence of an express agreement between the city and the Federal Parties, it is possible for the GSO PD officers to have acted, even with the government's direction or collaboration, yet not benefit from federal immunity. See, e.g., _In re World Trade Ctr._, 456 F. Supp. 2d at 566 (finding that "[t]he exercise of discretionary functions by the federal agencies did not conflict with a continuing obligation by [d]efendants to abide by the mandatory laws" applicable to them).

The second factor is whether a judgment could be structured to avoid or lessen any prejudice. Fed. R. Civ. P. 19(b)(2). The City argues that no judgment could be structured in the absence of the Federal Parties because there would be no way to determine obligations and entitlements, apply proper defenses or assign liability. (Doc. 10 at 15.) The City simply fails to demonstrate why this would be so. As noted above, other courts have had little trouble doing so where derivative federal sovereign immunity was the essence of the defense. Moreover, as will be seen in Section C _infra_, the more precise issue as to the surviving claims under 42

21

U.S.C. § 1983 may not be federal immunity *per se* but rather whether the GSO PD acted under "color of state law."

The third factor is "whether a judgment rendered in the person's absence would be adequate." Fed. R. Civ. P. 19(b)(3). The City merely parrots the rule, contending tautologically that "a judgment in the absence of the Federal Parties could not be adequate," because "[i]t could not be accurate or appropriate, and thus could not possibly be adequate." (Doc. 10 at 15.) This argument is not persuasive.

The fourth factor is "whether the plaintiff[s] would have an adequate remedy if the action were dismissed for non-joinder." Fed. R. Civ. P. 19(b)(4). The City argues that either Plaintiffs may be able to proceed against the Federal Parties under the Federal Torts Claims Act, 28 U.S.C. § 1346(b) (2006), or that if not, it is only because of Congress' determination that no such forum should exist. (Doc. 10 at 15.) This argument is undercut by the City's previous argument that joinder of the Federal Parties is not feasible because they are immune from suit. (Id. at 12-13.) Whether claims might exist against potential non-parties, moreover, need not be determined at this stage.

In the end, the City's argument depends on the proposition that its liability is fully dependent upon the actions of the Federal Parties. At this early stage based on the City's proffered

evidence, the City has failed to demonstrate that this is so and that the only equitable resolution must be dismissal of the action. Therefore, the City's motion to dismiss for failure to join an indispensable party is denied, without prejudice to it being raised later if supported by the facts.

**B.    State Sovereign Immunity Against Negligence Claims**

The City next moves to dismiss the negligence claims, Claims II and III of the Amended Complaint, based on its inherent sovereign immunity.[8]  (Doc. 9 ¶ 4; Doc. 15 ¶ 15.)

**1.    Municipal Sovereign Immunity**

North Carolina law generally provides immunity to a municipality if its employees negligently perform a governmental function.  <u>Clayton v. Branson</u>, 153 N.C. App. 488, 493, 470 S.E.2d 253, 256-57 (2002).  "Law enforcement is well-established as a governmental function," <u>id.</u> at 493, 470 S.E.2d at 257 (quotation

---

[8]    North Carolina law is unsettled regarding whether a motion to dismiss based on sovereign immunity presents a question of subject matter jurisdiction or personal jurisdiction.  <u>Teachy v. Coble Dairies, Inc.</u>, 306 N.C. 324, 328, 293 S.E.2d 182, 184 (1982); <u>Abbott v. N.C. Bd. of Nursing</u>, 177 N.C. App. 45, 50 n.2, 627 S.E.2d 482, 486 n.2 (2006). Although the North Carolina Courts of Appeals interpret the doctrine of sovereign immunity as divesting state courts of jurisdiction over the state's person, <u>Davis v. Dibartolo</u>, 176 N.C. App. 142, 144-45, 625 S.E.2d 877, 879-80 (2006), federal courts interpret the doctrine as divesting state courts of jurisdiction over the subject matter of particular claims against the state.  <u>In re Petrol Shipping Corp.</u>, 360 F.2d 103, 107 (2d Cir. 1966); <u>RPR & Assocs.</u>, 921 F. Supp. at 1460.  Despite this disagreement, the distinction appears to have no impact on the method of review.  <u>Ambrose v. Hunt</u>, No. 1:97CV276-T, 1997 U.S. Dist. LEXIS 21940, at *16 n.5 (W.D.N.C. Dec. 2, 1997).

23

marks and citations omitted), and includes the "training and supervision of officers by a police department." <u>Lyles v. City of Charlotte</u>, 120 N.C. App. 96, 100, 461 S.E.2d 347, 350 (1995), <u>rev'd in part on other grounds</u>, 344 N.C. 676, 477 S.E.2d 150 (1996).

In the Amended Complaint, Plaintiffs allege that the City (1) negligently conducted the investigation of Ms. Pettiford, and (2) negligently "failed to provide adequate training, supervision, and control of [its] police officers." (Doc. 12 ¶¶ 39-46.) These allegations relate directly to Defendant's law enforcement activities, which constitute a governmental function.[9] Thus, absent waiver, sovereign immunity would bar the negligence claims.

### 2. Waiver of Immunity

A municipality may waive its governmental immunity by participating in a local government risk pool or by purchasing liability insurance. N.C. Gen. Stat. § 160A-485(a) (2007). In the Amended Complaint, Plaintiff asserts that the City waived its immunity through the purchase of excess liability insurance.[10]

----

[9] To determine if an activity is a governmental function, courts examine the employee's activities at the time and place of the alleged negligence. <u>Jones v. Kearns</u>, 120 N.C. App. 301, 304, 462 S.E.2d 245, 247 (1995). There is an apparent tension between the City's argument that these functions are federal governmental functions, entitling the City to derivative immunity, and municipal functions, entitling the City to its defense of inherent sovereign immunity.

[10] The Amended Complaint alleges the City's purchase of liability insurance in only one of the two negligence claims. (Doc. 12 ¶ 47.) The City asserted in its motion that the failure to allege the purchase of insurance for the second negligence claim precludes Plaintiffs from

(Doc. 12 ¶ 47.) The City acknowledges that it participates in a Local Government Excess Liability Fund ("Fund") and purchased an excess liability insurance policy, but it claims that neither constitutes a waiver of its immunity. (Doc. 15 ¶ 15; Doc. 21 at 14-15.) In support of its defense, the City filed two affidavits of Everette Arnold, Executive Director of the Guilford City/County Insurance Advisory Committee, and the insurance contracts themselves.[11] (Docs. 19 & 33.)

### a. Local Government Excess Liability Fund

The City asserts that it has not waived its governmental immunity through its participation in the Fund. The City is self-insured up to $100,000. (Doc. 19 ¶ 3.) The Fund pays claims between $100,000 and $3,000,000, though the City is obligated to repay the Fund in the entirety. (Id.)

Based on the City's evidence, which is uncontested, the Fund does not waive the City's immunity. As explained in Dobrowolska ex

---

arguing the waiver of immunity for that claim. (Doc. 15 ¶¶ 3, 16; Doc. 21 at 14, 15.) Based on the liberal federal rules regarding motions to amend complaints, Fed. R. Civ. P. 15(a); Medigen of Ky., Inc. v. Pub. Serv. Comm'n, 985 F.2d 164, 167-68 (4th Cir. 1993), the parties stipulated at oral argument that Plaintiffs' Amended Complaint was deemed amended to allege in its other negligence claim that the City waived immunity. (Tr. of Oral Argument at 64.)

[11] Consideration of the affidavits and insurance contracts is proper, without converting the motion to dismiss to one for summary judgment, under motions filed pursuant to Rules 12(b)(1) and (b)(2) and with respect to state law claims. Beck v. City of Durham, 129 F. Supp. 2d 844, 848-49 (M.D.N.C. 2000).

_rel. Dobrowolska v. Wall_, 138 N.C. App. 1, 8-9, 530 S.E.2d 590, 596 (2000), the Fund fails to meet the statutory requirements of a local government risk pool because (1) two members, the Guilford County Schools and Guilford Technical Community College, are not local governments, N.C. Gen. Stat. §§ 58-23-5(a), 58-23-1; (Doc. 19 ¶¶ 5, 9); (2) no notice was given to the Commissioner of Insurance that the participating entities "intend[ed] to organize and operate [a] risk pool[]" pursuant to statute, N.C. Gen. Stat. § 58-23-5(e); (Doc. 19 ¶ 9); and (3) the Fund does not contain a provision for a system or program of loss control, N.C. Gen. Stat. § 58-23-15(1); (Doc. 19 ¶ 9). The Fund also does not constitute a local government risk pool because the City must repay the entire amount for claims between $100,000 and $3 million. N.C. Gen. Stat. § 160A-485(a); _Lyles v. City of Charlotte_, 344 N.C. 676, 680, 477 S.E.2d 150, 153 (1996).[12]

### b. Excess Liability Insurance

The City also asserts that it has not waived its governmental immunity through the purchase of excess liability insurance. (Doc. 15 ¶ 16; Doc. 21 at 14-15.) In an affidavit, the City acknowledges

---

[12] The Fund fails to meet several other statutory requirements. In particular, it (1) does not make any accounting reports available to the Commissioner of Insurance, N.C. Gen. Stat. § 58-23-26; (Doc. 19 ¶ 9); (2) does not file any financial statements with the Commissioner of Insurance, N.C. Gen. Stat. § 58-23-26; (Doc. 19 ¶ 9); and (3) has no authority or mechanism to assess members of the pool to satisfy any financial deficiencies, N.C. Gen. Stat. § 58-23-30(b); (Doc. 19 ¶ 9).

26

that it "purchased a $5,000,000.00 Excess Liability policy" to cover claims above $3 million. (Doc. 19 ¶ 11; Doc. 33 ¶ 3.) Although the City suggested initially, by implication, that this insurance policy would partially waive its immunity for claims between $3 million and $8 million (Doc. 21 at 14-15),[13] it now argues that the express terms of the insurance contract preclude any waiver of immunity. (Doc. 32; Tr. of Oral Argument at 57.)

### (1) Terms of Insurance Contract

Plaintiffs argue first that the City "cannot through the wording of its insurance contract avoid the waiver of immunity." (Doc. 34 at 1.) Any modifications to the doctrine of sovereign immunity, Plaintiffs contend, must emanate from the General Assembly. (Id. at 1-2.) Thus, Plaintiffs argue that the insurance policy provisions are unenforceable because they are contrary to law. (Id. at 1.) In essence, Plaintiffs appear to assert that the mere act of purchasing an insurance policy waives governmental immunity, regardless of the policy's underlying terms and conditions.

These arguments are without merit. The North Carolina General Assembly specifically allows insurance contracts to determine the

_____

[13] The City initially dealt with this partial waiver by stating that the $3 million self-insured retention should "fully immunize[] it in this lawsuit," especially given the "limited claims in this matter and the limited time period involved in the Plaintiffs' allegations." (Id. at 15.)

extent of a municipality's waiver of immunity. Although section 160A-485(a) of the North Carolina General Statutes indicates that waiver occurs "by the act of purchasing liability insurance," it further provides that "[i]mmunity shall be waived only to the extent that the city is indemnified by the insurance contract from tort liability." N.C. Gen. Stat. § 160A-485(a); accord Clayton, 153 N.C. App. at 493, 570 S.E.2d at 257. Based on this statutory authority, courts regularly examine the express terms of insurance contracts to resolve issues relating to waivers of immunity. Layman ex rel. Layman v. Alexander, 343 F. Supp. 2d 483, 493-94 (W.D.N.C. 2004) (holding that the purchase of insurance waives liability only for those actions covered by the policy); see Kephart v. Pendergraph, 131 N.C. App. 559, 567, 507 S.E.2d 915, 921 (1998) (finding that North Carolina courts have "consistently considered purchase of limited insurance coverage by a governmental entity to constitute partial waiver of sovereign immunity").

The cases Plaintiffs cite also do not help them. In Blackwelder v. City of Winston-Salem, the North Carolina Supreme Court denied the plaintiff's request to abolish or modify the sovereign immunity doctrine after concluding that the municipality had not met the statutory requirements for a waiver by purchasing liability insurance or participating in a local government risk pool. 332 N.C. 319, 322, 324, 420 S.E.2d 432, 434-35, 435-36

28

(1992).  In <u>Steelman v. City of New Bern</u>, the North Carolina Supreme Court likewise declined a plaintiff's request to abolish the doctrine of sovereign immunity.  279 N.C. 589, 594-95, 184 S.E.2d 239, 242-43 (1971).  Unlike those cases, the current action does not seek the abolition or modification of the sovereign immunity doctrine, but rather only the interpretation of an insurance contract pursuant to the statute governing waivers.

Plaintiffs argue that the City may not rest on language in the insurance contract stating that "'[t]his policy is not intended by the insured to waive its governmental immunity.'"  (Doc. 34 at 1.) While true in the abstract, this argument ignores the real issue: whether, and to what extent, does the excess liability insurance policy indemnify the City from tort liability and, thus, constitute a waiver of its governmental immunity?  Resolution of this issue requires an examination of the insurance contract.

### (2)  Extent of Waiver of Sovereign Immunity

The City argues that the express terms of the insurance contract preclude any waiver of governmental immunity, relying on <u>Magana v. Charlotte-Mecklenburg Board of Education</u>, 183 N.C. App. 146, 148-49, 645 S.E.2d 91, 93 (2007).[14]  (Doc. 32; Tr. of Oral

---

[14] Plaintiffs attempt to distinguish <u>Magana</u> because it arises under a statute governing boards of education instead of municipalities.  (Doc. 34 at 2.)  In all relevant terms, however, the waiver statutes are similar for boards of education and municipalities.  For example, both statutes deem waiver to occur upon the securing of insurance, while

29

Argument at 57.) In <u>Magana</u>, the North Carolina Court of Appeals held that a local governmental entity had not waived its immunity through the purchase of excess liability insurance. 183 N.C. App. at 149, 645 S.E.2d at 93. The court found that the insurance contract expressly conditioned coverage on the municipality's payment of a self-insured amount of less than $1 million for which the entity was immune, thus rendering coverage inapplicable in that case.[15] <u>Id.</u> at 148-49, 645 S.E.2d at 92-93. The City claims that the terms of its insurance contract are similar to those in <u>Magana</u>.[16] (Tr. of Oral Argument at 57.)

---

limiting the waiver to the extent of insurance coverage. <u>Compare</u> N.C. Gen. Stat. § 115C-42 <u>with</u> <u>id.</u> § 160A-485(a).

[15] The <u>Magana</u> policy provided: "when the insured's legal obligation to pay damages to which this insurance applies has been determined, and: (1) the amount of such damages is greater than . . . [$1,000,000], and (2) the insured has paid . . . [$1,000,000] to the claimant, then and only then will the insured be entitled to make claim for indemnity under this Policy." 183 N.C. at 148, 645 S.E.2d at 93 (internal quotation marks omitted).

[16] Courts have granted partial summary judgment to the City under prior, apparently distinguishable, iterations of its liability insurance. <u>See</u>, <u>e.g.</u>, <u>Howerton v. Fletcher</u>, No. 1:97CV00914, 1998 U.S. Dist. LEXIS 18353, at *30-31 (M.D.N.C. Sept. 21, 1998) (holding that the City was "entitled to any partial summary judgment on the basis of governmental immunity for damages up to $600,000.00, between $1.9 million and $2 million, and over $4 million" because it must pay the claim directly or reimburse the Fund but was not "entitled to summary judgment for damages between $600,000.00 and $1.9 million, and between $2 million and $4 million" because it "maintains liability insurance or is not obligated to repay the Fund"); <u>Clayton</u>, 153 N.C. App. at 493, 570 S.E.2d at 257 (affirming the trial court's conclusion that "'the purchase of liability insurance for liability of more than $2 million but less than $4 million' did not waive [the City's] immunity for liability less than $2 million"); <u>Schlossberg v. Goins</u>, 141 N.C. App. 436, 445, 540 S.E.2d 49, 55 (2000) (holding that "the City has waived its governmental immunity for damages greater than $2,000,000.00 and up to $7,000,000.00 by its purchase of

## (a) Applicable Policy

The court must first identify the applicable excess liability insurance policy for the negligence claims. In the Supplemental Affidavit, the City states that two insurance policies, a 2004 policy and a 2006 policy, apply to the negligence claims in this action. (Doc. 33 ¶ 4.) For each policy, the City states that (1) Part A (Public Liability) applies to covered incidents, such as bodily injury and personal injury, occurring during the policy period, and (2) Part B (Public Official Liability Claims Made Coverage) applies to claims for violations of civil rights or claims arising from an alleged policy or practice of the City that are made during the policy period. (<u>Id.</u>)

Part A of the 2004 insurance policy applies to the negligence claims in this action,[17] because the November 2004 incident falls

---

excess liability insurance").

[17] Section I.A.2 provides that "[t]his insurance applies to bodily injury[] [and] personal injury . . . which occurs during this policy period." (<u>Id.</u>, Ex. A, Pt. A § I.A.2 at 28 (emphasis omitted).) The policy defines "bodily injury" to include "bodily injury, sickness, disease, shock, fright, mental injury or anguish, emotional distress or disability." (<u>Id.</u> § IV.D at 40 (emphasis omitted).) This definition encompasses many of Plaintiffs' alleged injuries including, but not limited to, those in the Second Claim. (Doc. 12 ¶¶ 38, 40, 41, 45.) The policy also defines the term "personal injury" broadly. Personal injuries include non-bodily injuries arising out of (1) "[f]alse arrest, detention or imprisonment"; (2) "[m]alicious prosecution"; (3) "wrongful entry into[] or invasion of the right of private occupancy of a room, dwelling or premises"; and (4) "[e]lectronic or other publication, transmission, dissemination or storage of material" that either "slanders or libels a person" or "violates a person's right of privacy." (Doc. 33, Ex. A, Pt. A § IV.Q.1-5 at 44.) Personal injuries also generally include violations of civil rights and the "[f]ailure of . . . law enforcement

31

within the policy period from April 20, 2004, through April 20, 2005.[18]  (<u>Id.</u>, Ex. A, Pt. A § I.A.2 at 28; Declarations, Item 1 at 1.)  Even though Plaintiff alleges that Detective Sanders embarked on a campaign of harassment for an unspecified period of time following the initial detention (Doc. 12 ¶ 30), the 2004 policy still appears to apply because it specifically covers actions that continue or resume after the end of the policy period.  (Doc. 33, Ex. A, Pt. A § I.A.3 at 29.)

---

[personnel] . . . to follow departmentally approved policy(ies) or procedure(s).  (<u>Id.</u> § IV.Q.7, 10 at 44.)  This definition encompasses the Third Claim regarding the City's policies and practices.  (Doc. 12 ¶¶ 42-46.)  Obviously, if neither policy applies, the City enjoys its immunity anyway because no waiver exists.

    [18]  Part B does not appear to apply to these negligence claims.  As a "claims made" policy, the court must apply Part B from the policy in effect at the time the City received notice of the claim.  (Doc. 33, Ex. B, Pt. B § I.A.2.c at 48, § I.A.3.a at 48.)  Although the City has not specified the exact date of notice in the affidavits, by attaching the 2006 policy (Exhibit B to Supplemental Affidavit) it implies it received notice in 2006.  (<u>Id.</u>, Ex. B.)  While Part B covers claims for "wrongful acts" (<u>id.</u>, Ex. B., Pt. B § I.A.1 at 48), which means "any actual or alleged error or misstatement or misleading statement, act or omission, neglect, *negligence*, or breach of duty by an [employee] solely in the course of the [employee's] duties" (<u>id.</u> § V.Z at 60 (emphasis added), § II.B.3 at 55), and while the term "wrongful acts" is defined to include negligent actions by the City's employees, it has a slightly narrower scope than Part A because it purports not to cover negligent bodily injuries or certain negligent personal injuries.  (<u>Id.</u> § I.C.7 at 50, § V.O at 59.)  Even if Part A and Part B were to both apply, the 2004 and 2006 policies apply the coverage part with the higher limits.  (<u>Id.</u>, Ex. A, Pt. A, Endorsement No. 7 at 11; <u>id.</u>, Ex. B, Pt. B § III.E at 56.)  If Part A and Part B have equal limits, as in this action, "only one limit will still apply and it will be the each occurrence (Coverage Part A) Limit(s) of Insurance and its corresponding retained limit."  (<u>Id.</u>, Ex. B, Pt. B § III.E at 56 (emphasis omitted).)

**(b)  Exhaustion of Self-Insured Retention**

Section I.A.1 of Part A indicates that the 2004 policy[19] will indemnify the City for "ultimate net loss in excess of the retained limit which the Insured becomes legally obligated to pay."[20]  (_Id._, Ex. A, Pt. A § I.A.1 at 28 (emphasis omitted).)  This section subsequently clarifies that this "indemnification obligation shall not arise until the Insured itself has paid in full the entire amount of its retained limit" (i.e., $3 million).  (_Id._ Declarations, Item 2 at 1; Pt. A § I.A.1 at 28.)  Section I.B.2 also states that the City "shall make such claim for indemnification as soon as practicable _after it has paid or will pay the retained limit_."  (_Id._ Pt. A, § I.B.2 (emphasis added).) Thus, the City's excess liability insurance coverage is contingent upon its payment of the first $3 million of any damage award.

These policy provisions are substantially similar to those in _Magana_.  In particular, both policies disclaim any right of indemnification until (1) the damages exceed a self-insured retention amount ($1 million in _Magana_ and $3 million in this action); (2) the insured has a legal obligation to pay those

---

[19]  Sufficiently similar language appears in the 2006 policy.  (_Id._, Ex. B, Pt. A § I.A.1; _id._, Ex. B, Pt. B § I.B.1.)

[20]  Part A of the 2004 policy defines "Insured" to include the City itself, as well as any current or former employee acting within the scope of their duties.  (_Id._, Ex. A, Pt. A § II.A, B.3 at 37.)

33

damages; and (3) the insured actually pays those damages to the claimant.  <u>Magana</u>, 183 N.C. App. at 148, 645 S.E.2d at 92.  This case differs from <u>Kephart</u>, where the North Carolina Court of Appeals rejected this argument a decade earlier in the absence of an exhaustion requirement, because here Part A of the 2004 policy specifically requires the City to pay the self-insured retention as a prerequisite to coverage.  <u>Cf</u>. <u>Kephart</u>, 131 N.C. App. at 568, 507 S.E.2d at 921.

Based on the explicit language of the excess liability insurance policy, the City has not waived its immunity from common law negligence claims.[21]  This excess liability insurance does not apply unless and until the City has a legal obligation to pay the $3 million self-insured amount.  Because the City is immune from negligence claims up to $3 million, it will never have a legal obligation to pay this self-insured amount and, thus, has not waived its immunity through the purchase of this excess liability insurance policy.

In sum, the City has not waived its immunity to negligence claims through its participation in the Fund or the purchase of

---

[21]  This reading does not render the insurance coverage meaningless. The purchase of excess liability insurance may provide coverage for other types of claims where immunity is not available.  <u>Magana</u>, 183 N.C. App. at 149, 645 S.E.2d at 93 (noting immunity not available where federal or state statutes preclude its assertion, or because of exceptions to the doctrine, such as in contract cases).

34

excess liability insurance. Its motion to dismiss the Second and Third Claims of the Amended Complaint is therefore GRANTED.

### C. Section 1983 Claims

The City moves to dismiss Plaintiff's claim under section 1983 on two grounds: First, the City contends that, because this was a federal investigation, as a matter of law Plaintiffs cannot show that the alleged constitutional violations were caused by an official policy or custom of the City; second, it asserts that it enjoys derivative federal sovereign immunity that bars this claim. (Doc. 9 ¶ 5; Doc. 10 at 9-10, 18-19; Doc. 21 at 16-17.) Both arguments will be addressed below.

### 1. Official Policy or Custom

The City argues that Plaintiffs could not "establish that the municipality actually caused the alleged constitutional deprivation" because any harm suffered by Plaintiffs occurred at the direction of the Federal Parties rather than pursuant to its own official policy or custom. (Doc. 9 ¶ 5; Doc. 10 at 19; Doc. 15 ¶ 17; Doc. 21 at 16.) The City also argues that it cannot be held liable based on the theory of *respondeat superior*. (Doc. 9 ¶ 5; Doc. 15 ¶ 17; Doc. 21 at 16.) Plaintiffs agree, and the parties are therefore correct, that the City cannot be held liable based on *respondeat superior*. <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-91 (1978). Plaintiffs contend, however, that the Complaint

35

adequately pleads that the GSO PD acted pursuant to an official policy or custom that proximately caused the deprivation of their rights. (Doc. 13 at 6, 7.) The inquiry, then, is whether the Amended Complaint adequately states a claim under Rule 12(b)(6).

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint" and not to "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999) (quoting Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992)). When ruling on a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson, 127 S. Ct. at 2200, and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra, 120 F.3d at 474. The complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests," Erickson, 127 S. Ct. at 2200 (internal quotation marks omitted), yet "a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007). For civil rights actions, a court "must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by*

36

*the facts alleged*." Edwards, 178 F.3d at 244 (internal quotation marks and citation omitted).

Section 1983 provides a cause of action for constitutional deprivations arising from actions taken under color of state law. 42 U.S.C. § 1983 (2003). To state a cause of action against a municipality, a section 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right. Jordan *ex rel.* Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994); accord Monell, 436 U.S. at 691; Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). "Municipal policy may be found in written ordinances and regulations, in certain affirmative decisions of individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (internal citations omitted). "[A] municipal custom may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." Id. at 218 (internal quotation marks and citation omitted).

When considered in the light most favorable to Plaintiffs, the facts alleged are sufficient to state a section 1983 claim against

37

the City. In particular, Plaintiffs allege the existence of official policies regarding hiring, training and supervising the GSO PD officers. (Doc. 12 ¶¶ 33-35.) Plaintiffs also allege that these policies are fairly attributable to affirmative decisions of the City's policymakers or omissions that demonstrated the policymakers' deliberate indifference to the rights of citizens. (Id.) Furthermore, Plaintiffs allege that these policies directly or proximately caused the deprivation of their rights under the Fourth, Sixth and Fourteenth Amendments to the U.S. Constitution. (Id. ¶ 37.) The City's contention that its officers acted at the direction of the Federal Parties is an evidentiary-based contention that is not a proper defense under Rule 12(b)(6), which focuses on the Amended Complaint, but rather is more appropriately the subject of a motion for summary judgment, which is premature at this stage. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996) (finding that summary judgment is generally inappropriate absent fair opportunity for discovery). Thus, the City's motion to dismiss Plaintiffs' section 1983 claim for failure to plead the existence of an official policy or custom will be DENIED.

### 2. Derivative Federal Sovereign Immunity

The City moves to dismiss the section 1983 claim on the ground that the GSO PD officers were acting at all times at the direction

38

of the Assistant U.S. Attorney and/or the U.S. Attorney's Office. (Doc. 9 ¶ 5; Doc. 10 at 17 n.3, 19; Doc. 15 ¶ 17; Doc. 21 at 16-17.)  The City thus argues that because its officers were acting as federal officers it derivatively enjoys the sovereign and prosecutorial immunity of the Federal Parties.  (Doc. 10 at 9-10, 17 n.3.)  Despite the ambitious nature of this argument, the City cites to scant case law in support.  During oral argument, the City was unable to offer any reported case applying derivative federal immunities in the context of federal/state law enforcement presented here.  (Tr. of Oral Argument at 8-9.)

### a.  Admissibility of Affidavits

The City turns again to the affidavits of GSO PD Detective Jeff Flinchum, GSO PD Detective L.A. Holder and GSO PD Captain Gary Hastings, referenced in Section III.A.1.a.(1) of this opinion, to demonstrate it was acting at federal direction.  (Doc. 10 at 2-6; Doc. 21 at 3-8.)  Plaintiffs raise several evidentiary objections to these affidavits and have moved to strike them.[22]  (Docs. 14 & 25.)  The City contends that Plaintiff's objections are "futile" because, it asserts, Plaintiffs have admitted the facts underlying the affidavit.  (Doc. 21 at 16.)  At oral argument, however,

---

[22]  Plaintiffs' Second Motion to Strike refers generically to the Federal Rules of Evidence without citing a single rule.  Failure to cite a rule in the motion or brief is of little help to the Court and risks failing to preserve that ground.  LR7.2(a)(4); LR7.3(b).

Plaintiffs' counsel, at the court's inquiry, was not prepared to say whether Ms. Pettiford contested what she is alleged to have said or heard that is set forth in the City's proposed affidavits. (Tr. of Oral Argument at 42, 45-46.)

Plaintiffs argue that the inclusion of the affidavits would convert a Rule 12(b)(6) motion into one for summary judgment and maintain that it is premature, before discovery, to do so. (Doc. 13 at 5.) The City is correct that the affidavits are appropriate for consideration as to a sovereign immunity argument, which attacks subject matter jurisdiction under Rules 12(b)(1) & (2) and does not constitute a Rule 12(b)(6) motion. <u>Saval v. BL Ltd.</u>, 710 F.2d 1027, 1029 n.2 (4th Cir. 1983); <u>Googerdy v. N.C. Agric. & Tech. State Univ.</u>, 386 F. Supp. 2d 618, 621 n.1 (M.D.N.C. 2005). The court will treat the City's motion as one based on sovereign immunity under Rule 12(b)(1), as it is styled, and will consider the affidavits for that purpose only.

Turning to the affidavits themselves, all three in question purport to testify to conversations of the Assistant U.S. Attorney and GSO PD Detective Sanders about the investigation that were contained in audiotapes. In his affidavit, Detective Flinchum, a forensic computer detective, purports to testify to conversations of these and other third parties that he gleaned from audiotapes, some of which were reportedly made by GSO PD Detective Sanders.

40

(Doc. 11 ¶¶ 3, 4, 6-15.) Flinchum was not a party to the conversations and does not lay a sufficient foundation for recognition of the speakers' voices. Nor does he indicate the source of the recordings, the manner in which they were made, their authenticity and thus their reliability, or their preservation such that no changes, additions or deletions were made. Flinchum does not disclose whether the conversations he reports originated from audiotapes recorded by the GSO PD, a party to the case, or some third person; he fails to provide chain of custody as well. While wide discretion is accorded a decision on admissibility of recordings, here the report is third hand and these deficiencies render Flinchum's affidavit inadmissible. Fed. R. Evid. 901(b)(5); <u>United States v. Branch</u>, 970 F.2d 1368, 1371-72 (4th Cir. 1992).

Captain Hastings' affidavit suffers from similar flaws. While Hastings lays a sufficient foundation for recognizing the voices of the Assistant U.S. Attorney and GSO PD Detective Sanders on the recordings based on his personal knowledge (Doc. 16 ¶ 3), he, too, was not a party to the conversations and fails to lay a proper foundation for the origin of the audiotapes, including the manner and source of their making, the dates they were made, and chain of custody. <u>Branch</u>, 970 F.2d at 1371-72. Because of the authenticity of the underlying audiotapes is not established, Hastings' testimony in his affidavit is not admissible. Thus, neither

41

affidavit has laid a proper foundation for the recordings and consequently the statements allegedly made by the persons therein. While the testimony contained therein is not admissible for determination of the motion to dismiss the section 1983 claim, the court will not "strike" these two affidavits, as Plaintiffs request (Doc. 14, 25), because that remedy is more appropriate for pleadings.[23] Fed. R. Civ. P. 12(f); <u>Int'l Longshoremen's Ass'n, Steamship Clerks Local 1624 v. Va. Int'l Terminals, Inc.</u>, 904 F. Supp. 500, 504 (E.D. Va. 1995).

Finally, in her affidavit Detective Holder testifies to conversations that occurred during an interview she conducted with Ms. Pettiford and Ms. Pettiford's counsel, presumably after the November 9, 2004 incident, though no date is ever disclosed ("Represented Interview"). (Doc. 20 ¶¶ 3, 5-10.) Detective Holder also testifies she made a recording of the Represented Interview. (<u>Id.</u> ¶ 3.) Because she attended the Represented Interview and testifies from her personal knowledge, Holder lays the proper foundation for her testimony about what Ms. Pettiford said at that time. To the extent any portion of her testimony may be interpreted to have resulted from a review of the audiotape of the

---

[23] Plaintiffs have not identified any procedural basis for the Motion to Strike Affidavit (Doc. 14), the Second Motion to Strike (Doc. 25), or the supporting briefs (Docs. 14 & 26), despite the requirement to do so in Local Rules 7.2(a)(4) and 7.3(b).

Represented Interview, it may be considered refreshed recollection under Rule 612, Fed. R. Evid. <u>United States v. Cranson</u>, 453 F.2d 123, 124 (4th Cir. 1971) (ruling that the manner in which counsel may refresh a witness's recollection is "largely within the discretion of the [t]rial [j]udge"); see <u>20th Century Wear, Inc. v. Sanmark-Stardust Inc.</u>, 747 F.2d 81, 93 n.17 (2d Cir. 1984) (permitting the use of a audiotape to refresh a witness's recollection). Even though the City has not turned over the audiotape because the North Carolina State Bureau of Investigation ("SBI") objected to its production a year ago,[24] for purposes of the present motion the court will accept all statements in the affidavit attributed to Ms. Pettiford during the Represented Interview. Fed. R. Evid. 612(2) (permitting testimony before disclosure of writing relied upon by witness in court's discretion and the interests of justice). Ms. Pettiford's statements constitute admissions under Rule 801(d)(2), Fed. R. Evid., as to what the U.S. Attorney's office and Detective Sanders told her. They do not establish the fact or scope of the federal investigation, however, which remains hearsay for which no exception applies. Rules 801(c) & 804, Fed. R. Evid. Finally, Detective Holder's attempt to lay the foundation for the recordings

---

[24] The City had not inquired of the North Carolina SBI before oral argument whether it had amended or removed any objection to the release of the audiotapes. (Tr. of Oral Argument at 5.)

referenced in the Flinchum affidavit fails, because those recordings remain unauthenticated and the conversations predicted on them therefore inadmissible. Fed. R. Evid. 901(b)(5); Branch, 970 F.2d at 1371-72. For the reasons noted above and subject to this analysis, Plaintiffs' motion to strike the affidavit of Holder (Doc. 25) is DENIED.

On the present record based on the admissible portions of Detective Holder's affidavit, therefore, Ms. Pettiford admitted the following during the Represented Interview: The Assistant U.S. Attorney was present for part of her six-hour November 9, 2004 interview, introduced himself as a federal attorney, and told her she "messed up" his federal investigation. (Doc. 20 ¶ 5.) He then turned the interview over to Detective Sanders, who gave her his business card (presumably as GSO PD, as there is no evidence otherwise), cautioned her about the penalty for "lying to a federal agent," and warned that her cooperation would earn her a lessened sentence by the U.S. Attorney's Office. (Id. ¶¶ 5-6.) Sanders also acted as a go-between with the U.S. Attorney's Office over time as she, directly or through her counsel, tried to inquire as to her status, and Sanders made it clear that the Assistant U.S. Attorney's Office had the ultimate decision on her fate. (Id. ¶¶ 6-9.) Thus, having resolved these evidentiary objections, the court now turns to the legal analysis of the City's position.

44

### b.   Derivative Immunity

The City relies on the novel theory of derivative sovereign immunity to disclaim liability for the GSO PD officers' alleged conduct under section 1983.  In particular, the City depends solely on Butters v. Vance International, Inc., 225 F.3d 462, 465-67 (4th Cir. 2000), to advance this theory.  Nyla Butters was a security firm contract employee who claimed employment discrimination when she was denied an assignment to guard Princess Anud, wife of Saudi King Fahad, who was receiving medical treatment in California.  Id. at 464.  The Saudi government ordered Butters off the detail because her presence with other male Saudi guards was incompatible with Islamic law.  Id.  Butters' claim under California law was dismissed as barred by derivative sovereign immunity granted by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611.  Id. at 465.

For several reasons, Butters is inapposite.  First, immunity arose under a unique statute that granted immunity to foreign sovereigns, not the United States.  Id.  Second, Butters was a contract employee of a private firm, such that she was under the direct control of, and bound to follow directions of, its employer, the foreign sovereign.  Id. at 464.  Third, a foreign sovereign's decision as to how best to secure the safety of its leaders is "quintessentially an act 'peculiar to sovereigns.'"  Id. at 465

45

(quoting Saudi Arabia v. Nelson, 507 U.S. 349, 361 (1993)). Fourth, Butters permitted derivative sovereign immunity to avoid the application of state, not federal, law (although it is not clear that distinction would have changed the outcome there). Id. at 464. Finally, the Fourth Circuit acknowledged that the case involved respect for (not approval of) the diverse cultural and political values of a foreign sovereign. Id. at 467. None of these considerations applies in the present case, and the City offers no other case law or analogous situation under which its alleged immunity should apply derivatively.

### c. Alternative Legal Frameworks

At oral argument, the City was hard-pressed to identify a legal framework for analyzing whether its employees acted as federal agents during the underlying investigation of the Pettifords and whether such a determination, if found, compels dismissal for want of subject matter jurisdiction based on derivative federal immunity. (Tr. of Oral Argument at 6-11, 27-31, 62-63.) Plaintiffs, by the same token, could not identify any case law to support their contrary proposition that individual GSO PD officers cannot "make a relationship with the federal government without there being some sort of official agreement." (Id. at 36.)

The court has conducted independent research, which demonstrates that other courts have articulated at least four

46

frameworks to determine whether a local law enforcement officer or official may be deemed a federal agent for purposes of tort liability: (1) statutory cross-deputation; (2) totality of the circumstances; (3) borrowed servant doctrine; and (4) government contractor defense. Although these frameworks arise in different contexts, they share common principles, especially the emphasis on day-to-day control or supervision of the employee(s) in question. Each is discussed in turn.

### (1) Cross-Deputation

The Intergovernmental Personnel Act of 1970, as amended, authorizes the assignment of employees from state or local governments to federal agencies.[25] 5 U.S.C. §§ 3371-76 (2007). This statute sets forth procedures by which local law enforcement officers may be deputized as federal agents "for work of mutual concern to . . . [the federal] agency and the State or local government." Id. § 3372(a)(2). A cross-deputized employee may either "be *appointed* in the Federal agency," or may "be deemed *on detail* to the Federal agency." Id. § 3374(a)(1)-(2) (emphasis added). The assignment requires a written agreement between the

---

[25] Congress also adopted specific deputation statutes for certain federal agencies. For example, Congress authorizes the deputation of local law enforcement officers by the U.S. Marshals Service, 28 U.S.C. § 566(c); 28 C.F.R. § 0.112 (2008), and the Drug Enforcement Administration ("DEA"), 21 U.S.C. §§ 873(a)(7), 878(a) (1999); 28 C.F.R. § 0.100.

47

employee, the federal agency, and the local government.[26]  28 C.F.R. § 334.106.  This requirement avoids the very proof problems that inhere in informal relationships.

Cross-deputized local law enforcement officers enjoy certain immunities and protections of federal officers acting under color of federal law.  Of particular relevance to this action, section 3374(c)(2) provides that a local government employee "is deemed an employee of the agency for the purpose of . . . the Federal Tort Claims Act and any other Federal tort liability statute." 5 U.S.C. § 3374(c)(2).  As federal agents, cross-deputized local law enforcement officers avoid prosecution under section 1983 because they are not acting under color of state law.  Harris v. Gadd, No. 4:06CV01510 SWW, 2008 U.S. Dist. LEXIS 7295, at *10, *10-11 n.7 (E.D. Ark. Jan. 16, 2008) (dismissing section 1983 claim because state police officers committed alleged constitutional deprivations while acting within the scope of their employment as federal agents); see Petty v. United States, 80 Fed. App'x 986, 989 (6th Cir. 2003) (noting that cross-deputized local employees are considered federal employees for purposes of the Federal Tort Claims Act); Ellis v. Ficano, No. 94-1039, 1995 U.S. App. LEXIS

[26]  The Office of Personnel Management has developed a list of information that federal agencies must include in the written agreement. U.S. Office of Personnel Management, Provisions of the Mobility Program, available at http://www.opm.gov/PROGRAMS/IPA/Mobility.asp (last updated Sept. 2002).

38840, at *20 (6th Cir. Dec. 27, 1995) (affirming that federal officers are subject a claim under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), for alleged constitutional deprivations). <u>But see</u> <u>Aikman v. County of Westchester</u>, 491 F. Supp. 2d 374, 380 (S.D.N.Y. 2007) (concluding that cross-deputized local employees are still subject to section 1983 liability because that provision does not fall within section 3374's exemption of claims brought under "any Federal tort liability statute"). Furthermore, at least one court has held that a cross-deputized local employee is no longer a state actor subject to suit under section 1983 and dismissed section 1983 claims against the underlying local government. <u>Bordeaux v. Lynch</u>, 958 F. Supp. 77, 84, 84 n.5 (N.D.N.Y. 1997).[27]

---

[27] Onondaga County and the Onondaga Sheriff's Department filed a motion to dismiss for failure to state a claim under section 1983, pursuant to Rule 12(b)(6), Fed. R. Civ. P. <u>Id.</u> at 80-81. The City of Syracuse similarly moved for judgment on the pleadings, pursuant to Rule 12(c), Fed. R. Civ. P., and for summary judgment, pursuant to Rule 56(a), Fed. R. Civ. P. <u>Id.</u> The court considered these motions as motions for summary judgment and granted them after finding that local law enforcement officers had acted under color of federal law during an allegedly illegal search and seizure and, thus, were not subject to section 1983. <u>Id.</u> at 81, 84. Although these officers were employed by the local governments, they were also cross-deputized as members of the Central New York Drug Task Force, through which the DEA, the City of Syracuse, and Onondaga County Sheriff's Department conducted joint investigations. <u>Id.</u> at 84, 84 n.5. Based on a certificate of federal employment, the Task Force agreement and numerous affidavits, the court found that these officers were indeed federal employees for purposes of the Federal Tort Claims Act and other tort liability statutes. <u>Id.</u> at 84.

Here, the City has proffered no evidence that Detective Sanders was cross-deputized as a federal agent. At oral argument, the City acknowledged it was unaware of any formal, written relationship between the Federal Parties and the GSO PD or City. (Tr. of Oral Argument at 4.) The City also admitted that it did not know what was authorized, or how, as part of any federal investigation. (Id. at 22.) The City's evidence is not helpful, as it suggests that Detective Sanders gave his GSO PD business card to Ms. Pettiford. (Doc. 20 ¶ 6.) Plaintiffs also allege that Detective Sanders "displayed the insignia and badges of the police department." (Doc. 12 ¶ 11.) Thus, the City fails to establish that Detective Sanders was cross-deputized as a federal agent.

### (2) Totality of the Circumstances

A second framework is a functional approach based on the "totality of the circumstances" surrounding the alleged constitutional deprivation. The mere participation of local or state employees in the alleged actions does not definitively establish that the alleged deprivation occurred under color of state law, a requirement for section 1983 liability.[28] If the

_____

[28] Several courts have held that state, local and other non-federal employees acted under color of state law, despite federal involvement. Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 399 (1979) (holding that the requirement of federal approval did not foreclose a finding that the stage agency acted under color of state law because the states and their political subdivisions exercised control over the actual implementation of the program); Johnson v. Orr, 780 F.2d 386, 393 n.12 (3d Cir. 1986) (holding that the state adjutant general

50

totality of the circumstances suggests that the alleged actions are under federal authority, or the facts "cast an indelibly federal hue" on those actions, the local or state employees may be deemed to be exempt from prosecution under section 1983.[29]

Although the Fourth Circuit has not expressly addressed this issue,[30] courts nationwide weigh several factors to determine

acted under color of state law in discharging Air National Guard technicians, even though the technicians were federal employees for certain purposes); <u>De Tore v. Local #245 of the Jersey City Pub. Employees Union</u>, 615 F.2d 980, 983 (3d Cir. 1980) (granting summary judgment after concluding that the municipality acted under color of state law by controlling the planning and implementation decisions of the federally funded programs); <u>Jarno v. Lewis</u>, 256 F. Supp. 2d 499, 503 (E.D. Va. 2003) (denying a motion to dismiss after finding that a jail authority acted under color of state law, even though it housed detainees pursuant to a federal contract, because the alleged constitutional deprivations resulted from its alleged failure to train its guards and its alleged condonation of an unconstitutional policy and practice).

[29] <u>Rosas v. Brock</u>, 826 F.2d 1004, 1007 (11th Cir. 1987) ("Where the challenged action by state employees is nothing more than application of federal rules, the federal involvement in those actions is so pervasive that the actions are taken under color of federal and not state law."); <u>Ellis v. Blum</u>, 643 F.2d 68, 83, 84 n.17 (2d Cir. 1981) (holding that state employees acted under color of federal law when (1) they issued pretermination notices to Social Security disability recipients in accordance with federal procedures prescribed by the Secretary, (2) funding was entirely of federal origin, and (3) they functioned solely as the Secretary's agents); <u>North Carolina ex rel. Haywood v. Barrington</u>, 256 F. Supp. 2d 452, 460-61 (M.D.N.C. 2003) (holding on summary judgment that state officials had not acted under color of state law in seizing defendant's currency because federal officials subsequently seized the currency and conducted forfeiture proceedings as a federal action under federal law); <u>Ostroff v. Florida Dep't of Health & Rehabilitative Servs.</u>, 554 F. Supp. 347, 350, 353 (M.D. Fla. 1983) (holding that state agency and state official acted under color of federal law in terminating Social Security benefits).

[30] In <u>Buonocore v. Harris</u>, the Fourth Circuit mentioned, without discussion, that the district court had dismissed a section 1983 claim against a deputy sheriff who was acting "pursuant to federal, not state, law" by participating in the execution of a federal search warrant. 65

whether the actions causing the alleged deprivation occurred under color of state or federal law. In cases implicating local or state law enforcement officers, courts have considered whether the officers (1) participated in a clearly federal investigation or in a federally instigated raid, Askew v. Bloemker, 548 F.2d 673, 677 (7th Cir. 1976); Wilkinson v. Hallsten, No. 5:06CV2, 2006 U.S. Dist. LEXIS 53822, at *25 n.7 (W.D.N.C. Aug. 2, 2006); Macaluso v. Dane County, No. 94-1904, 1995 Wisc. App. LEXIS 637, at *11 (Wis. Ct. App. May 18, 1995); (2) presented local, state or federal identification, or were cross-deputized as federal agents, Askew, 548 F.2d at 677; Wilkinson, 2006 U.S. Dist. LEXIS 53822, at *25 n.7; (3) received payment from the local, state or federal government, Askew, 548 F.2d at 677; (4) had only a de minimis involvement in the actions, id. at 677-78; (5) acted pursuant to federal law, id. at 677; Wilkinson, 2006 U.S. Dist. LEXIS 53822, at *25 n.7; Macaluso, 1995 Wisc. App. LEXIS 637, at *11; and (6) performed their day-to-day operations under the control or supervision of the local, state or federal government. Askew, 548 F.2d at 677; Macaluso, 1995 Wisc. App. LEXIS 637, at *11. None of these factors, in isolation, establishes that municipal employees acted under color of state or federal law. In the totality of the

---

F.3d 347, 350-51 (4th Cir. 1995).

circumstances, however, these factors inform the resolution of the state action question.

In Askew, the court affirmed the district court's grant of summary judgment on section 1983 claims after finding that the local law enforcement officers had participated in a drug raid while acting under color of federal law.  548 F.2d at 678.  Several of the officers were employed by federal agencies, while three were employed by the St. Louis Police Department; all were  assigned as full-time members of the St. Louis Office for Drug Abuse Law Enforcement ("DALE"), an agency of the U.S. Department of Justice. Id. at 677.  The plaintiffs argued that section 1983 applied to the three municipal officers because they had acted concurrently under color of federal and state law.[31]

The court concluded that the "totality of the circumstances" surrounding the drug raid demonstrated that the officers acted under color of federal law.  Id.  Specifically, the court found that the DALE agents conducted the raid pursuant to a federal investigation for violations of federal law.  Id.  In addition, the DALE agents were "clearly directed by and subject to the immediate

---

[31]  The plaintiffs also argued that section 1983 applied to the remaining seven federal officers because they "acted in concert" with the local officers and with state officers called in as backup.  Id.  The court rejected this argument because (1) the local officers acted under color of federal law; (2) the state officers had only a de minimis involvement in the raid; and (3) the plaintiffs failed to allege a conspiracy between the DALE officers and the state officers.  Id. at 677-78.

control of DALE supervisors." Id. Although the municipal agents remained accountable to their police supervisors, were paid by checks issued by the municipality, and one agent displayed his municipal badge to gain admission to the premises, the court found that "the mere assertion that one is a state officer does not necessarily mean that one is acting under color of state law." Id. Other facts also "cast an indelibly federal hue upon the activities of these agents" because the agents carried official Department of Justice credentials, received payment from federal funds, and were eligible for benefits under the Federal Employees Compensation Act. Id.

In the present case, although the City suggests that Detective Sanders (and by extension the other GSO PD officers) participated in a federal investigation, it provides no evidence of the nature of the GSO PD's role in the federal investigation or that its officers were carrying federal credentials, supervised by federal officials, paid by the federal government, or covered by federal benefits. (Tr. of Oral Argument at 22.) Nor does this case involve a single, focused incident, such as a federal raid, but rather an allegedly extended course of conduct over time. Even if the court were to extend this doctrine to a potential claim of sovereign immunity as asserted, therefore, the City has not adduced sufficient evidence at this stage to demonstrate that under the

54

totality of the circumstances the alleged deprivation occurred under color of federal law.

### (3) Borrowed Servant Doctrine

The borrowed servant doctrine[32] is a common law doctrine that apportions tort liability between multiple parties when an employer loans an employee to another employer. If the borrowing employer exercises the same right of control over the employee as was originally possessed by the lending employer, the borrowing employer may become the temporary master of, and assume liability in *respondeat superior* for, the borrowed employee's negligent acts. Harris v. Miller, 335 N.C. 379, 387, 438 S.E.2d 731, 735 (1994). This right of control refers "not only to the work to be done *but also to the manner of performing it*." Id. (quoting Weaver v. Bennett, 259 N.C. 16, 28, 129 S.E.2d 610, 618 (1963)).

Courts must determine which employer has the right to control an employee. Under North Carolina law, "where the parties have made an explicit agreement regarding the right of control, this agreement will be dispositive." Id. at 387, 438 S.E.2d at 735. If the parties have not executed an agreement, North Carolina courts weigh several factors: (1) "whether the . . . [borrowed] servant is a specialist"; (2) "which employer supplies the

---

[32] This doctrine is alternatively known as the "loaned servant doctrine," "lent servant doctrine," "loaned employee doctrine," "borrowed employee doctrine," and "hired servant doctrine."

55

instrumentalities used to perform the work"; (3) "the nature of those instrumentalities"; (4) "the length of the employment"; (5) "the course of dealing between the parties"; and (6) "whether the temporary employer has the skill or knowledge to control the manner in which the work is performed and whether the temporary employer in fact exercises such control." Id. at 387-88, 438 S.E.2d at 736. The most important factor is the actual exercise of control. Id. at 388, 438 S.E.2d at 736. "Absent evidence to the contrary, the original employer is presumed to retain the right of control." Id. Whether one party is the sole master to whom liability can attach is usually a question of fact to be decided by a jury. Weaver, 259 N.C. at 27, 129 S.E.2d at 617.

Although the borrowed servant doctrine usually arises in the context of arrangements between private entities or between private and governmental entities, some courts have held that this doctrine may shift tort liability from a state or municipality to the federal government under certain circumstances. Amoakohene v. Bobko, 792 F. Supp. 605, 609 (N.D. Ill. 1992)[33]; see Dellums v.

_____

[33]  In Amoakohene, the court held that a loaned servant doctrine relationship existed among three municipal police officers and the federal government. 792 F. Supp. at 609. The police officers were members of a joint task force between the DEA and the Chicago Police Department who had allegedly violated the constitutional rights of the plaintiffs through a false arrest and false imprisonment, among other things. Id. at 607. The court found that the police officers were acting under the direct supervision and control of the DEA, pursuant to a written agreement, at the time of the alleged constitutional deprivations. Id. at 608-09. Although the court noted that the City

56

<u>Powell</u>, 566 F.2d 216, 221-22 (D.C. Cir. 1977) (holding that the borrowed servant doctrine is inapposite where the District of Columbia and United States engage in mutual or joint law enforcement action); <u>Chang v. United States</u>, No. 02-2010 (EGS), 2007 U.S. Dist. LEXIS 49405, at *41-43 (D.D.C. July 10, 2007) (denying summary judgment based on the borrowed servant doctrine after finding genuine issues of material fact regarding whether the county police officers were under the control of the county police, the U.S. Park Police, or both); <u>Kish v. Montana State Prison</u>, 161 Mont. 297, 305, 505 P.2d 891, 895 (1973) (holding that loaned servant doctrine barred tort claim against state prison that acted under the control and direction of the U.S. Forest Service).

In this action, the City has not proffered sufficient evidence to demonstrate that Detective Sanders or the other GSO PD officers were borrowed servants. The City stated in oral argument that it is unaware of any formal, written agreement between the Federal Parties and the GSO PD or City to loan its employees to the federal government. (Tr. of Oral Argument at 4, 22.) Under the multi-factored test, the City fares no better. Although Detective Sanders and the other officers might qualify as "specialists," the City has not produced evidence regarding which employer supplied

---

paid the police officers during their tenure on the task force, it concluded that these payments did not undermine the analysis because they were required under the terms of the written agreement. <u>Id.</u> at 609.

the instrumentalities, the length of employment, or the course of dealing between the City and the Federal Parties. While the Federal Parties can be assumed to have the expertise to control how the work is performed, the City has provided little evidence establishing the Federal Parties' exercise of control over Detective Sanders or the GSO PD officers. (Id. at 22.) Thus, absent additional evidence, the City is presumed to retain control over its employees and liability for their actions.

### (4) Government Contractor Defense

Courts have recognized a brand of derivative immunity relating to work primarily arising from the performance of government contracts. The doctrine of derivative federal sovereign immunity arose as an exception to federalism and is based on the notion that the immunity traditionally afforded the federal government should extend under limited circumstances to certain parties who carry out its will. The Supreme Court first recognized the doctrine in the context of private contractors in Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 20-21 (1940) (immunizing a private contractor from a Fifth Amendment takings claim when the contractor had constructed dikes at the federal government's direction that caused erosion on plaintiffs' land). The doctrine is perhaps most famously articulated in Boyle v. United Technologies Corp., where the Court addressed, under what has become known as the "government

contractor defense," whether a contractor to the U.S. Navy could be immune from state tort liability for a helicopter design that allegedly caused death.  487 U.S. 500, 502 (1988).

The touchstone for the doctrine — and frequently the dispositive issue — is the identification of a "uniquely federal interest" justifying displacement of state law with federal common law.  Id. at 504.  In Boyle, the Court found unique federal interests involving (1) the obligations to, and rights of, the United States under its contracts; (2) the liability of federal officers for official acts; and (3) civil liabilities arising out of federal procurement contracts relating to national defense.  Id. at 504-06.  Courts have subsequently found unique federal interests in, among other things, coordinating federal disaster assistance, In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 197 (2d Cir. 2008), pursuing specific military objectives, In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 96 (2d Cir. 2008); and securing uniform standards by which to govern agreements to arbitrate international disputes, Certain Underwriters at Lloyd's London v. Argonaut Ins. Co., 500 F.3d 571, 579-80 (7th Cir. 2007). If such a unique federal interest exists, derivative immunity will still not apply unless there is a "significant conflict" between federal policy and the state law sought to be applied.  Boyle, 487 U.S. at 507-08.

59

Derivative immunity requires, in the contractor context, satisfaction of a three-pronged test: (1) "reasonably precise specifications" approved by the federal government; (2) equipment by the contractor that conformed to those specifications; and (3) a warning to the federal government by the contractor of a defect unknown to the government. Id. at 512. "The very essence of the defense is to 'prevent the contractor from being held liable when the government is actually at fault,' for '[w]hen a contractor acts under the authority and direction of the United States, it shares in the immunity enjoyed by the Government.'" In re World Trade Ctr., 456 F. Supp. 2d at 562 (internal citations omitted). Where a private contractor acts independently of precise directions and approvals, however, the defense is unavailable. Trevino v. Gen. Dynamics, Corp., 865 F.2d 1474, 1480 (5th Cir. 1989). The level of governmental control required is significant; merely providing general direction while leaving the implementation to others will not suffice. Boyle, 487 U.S. at 509.

While this framework is consistent in many ways with the three prior methods of analysis and provides a useful framework for analyzing the City's motion, it points out several weaknesses in the City's argument. First, and perhaps most obvious, is the fundamental fact that this form of derivative sovereign immunity defense displaces *state* law that conflicts with uniquely federal

60

interests.  In this section 1983 claim, the City seeks to avoid *federal*, not state, law – a remedy to which the doctrine has not been extended.  Id. at 508 n.3 ("see[ing] nothing to be gained" by doing so).

Second, and closely related, is the reality that general law enforcement (even money laundering and drug dealing, allegedly at issue here) is not a uniquely federal interest.  State and federal law enforcement authorities frequently coordinate investigations and work in tandem to achieve commonly desired outcomes.  To its citizenry, however, the City continues to owe its own, independent duty to protect and defend.  See <u>In re World Trade Ctr.</u>, 456 F. Supp. 2d at 566.

Common in the various immunity frameworks is a relationship, almost exclusively in the form of a written agreement, giving rise to the expectation that the federal government's precise directions will be followed.  Here, no such formal arrangement has yet been shown to exist.  Lacking here as well is any evidence of the kind of reasonably precise direction or specifications mandated by <u>Boyle</u>.  Even if all the proposed (including inadmissible) evidence of the City is considered,[34] the Federal Parties are shown at best

---

[34]  At oral argument, the City conceded that the underlying recordings and any information that may be privileged under Rule 6(e), Fed. R. Crim. P., need not be reviewed if the court considered the materials in the affidavits themselves. (Tr. of Oral Argument at 49-56.)

61

to have directed the overall goals of the Pettiford investigation. Where the goal or outcome is specified by the federal government but the manner of execution is left to the discretion of the contractor, immunity is not mandated. <u>Boyle</u>, 487 U.S. at 509 (noting that the contractor can comply with the federal direction and its own duty of care). There is simply no evidence that the activities alleged in the Amended Complaint were directed by the Federal Parties in the manner alleged. (Tr. of Oral Argument at 22.) Put another way, on the current record — even if the information in all of the City's affidavits were considered — it is equally as likely that the City, as a cooperating local entity, was asked to interview Plaintiff Nicole Pettiford and to try to obtain consent to a search of her house and automobile, leaving the City to choose how and under what circumstances to do so. In fact, such a conclusion could be inferred from the City's proposed evidence that the Assistant U.S. Attorney was present for part of the November 9, 2004, interview of Ms. Pettiford but then left GSO PD Detective Sanders to handle the details. (Doc. 11 ¶ 7; Doc. 16 ¶ 9; Doc. 20 ¶ 5.) In order to have avoided these pitfalls of unclear mandates and conflicting inferences, Congress specifically provided a statutory mechanism for loaning a state law enforcement officer to a federal detail discussed previously. For whatever reasons, such a device does not appear to have been used here.

62

In many respects, the City's argument resembles that of the
City of New York, its contractors and several others in the wake of
the clean-up of the World Trade Towers after the terrorist attacks
of September 11, 2001. *In re World Trade Ctr.*, 456 F. Supp. 2d at
560. The City of New York sought derivative sovereign and other
immunities against state liability for respiratory and other
injuries based on its claim that the federal government, largely
through Army Corps of Engineers, Environmental Protection Agency
and Occupational Health & Safety Administration, directed the
clean-up. *Id.* at 538, 560, 563, 566, 567. Based on an analysis of
*Boyle*, *Yearsley* and other cases applying the government contractor
defense, the court declined to extend derivative sovereign immunity
to those defendants. *Id.* at 560-66. It concluded that, while the
federal government clearly directed aspects of the clean-up, it
"never divest[ed] the City of its authority or its duty to protect
those working at its behest," but rather "exercised its authority
in conjunction with the City." *Id.* at 565. A picture of
"cooperation and collaboration" rather than "exclusive federal
control" emerged. *Id.* at 566. Thus, while the court was willing
to cloak the City with the federal immunities if the evidence later
developed to show federally instructed discretionary decisions, no
such showing had been made. *Id.*

63

In sum, on the present record the City continues to face legal and factual hurdles in its quest to benefit from derivative federal sovereign immunity. Cooperation between federal and local authorities is critical to effective law enforcement, and the court is sensitive to the need to encourage, not hinder, such efforts. It is for this reason that the court engaged in the lengthy analysis above based on research independent from the parties' briefing. But even if such a defense could apply, at this point in the proceeding the record lacks sufficient evidence to warrant it. The court also finds that this result does not change under any of the potential analyses above if all the proposed (but inadmissible) evidence of the City in the Hastings, Flinchum and Holder affidavits were credited. Disposition of the derivative immunities defense is therefore not dependent on the admissibility of that testimony.

The above analysis reveals that the City's motion as styled is misdirected. The question is not whether the City, the sole defendant, is immune because it was acting as a federal agent. Rather, because no liability lies under section 1983 for actions taken under color of federal law, District of Columbia v. Carter, 409 U.S. 418, 424-25 (1973); Pardo, 1994 U.S. App. LEXIS 5372, at *3, the real issue for the City is whether it can show that Plaintiffs cannot prove an element of their section 1983 claim —

64

that the City acted under "color of state law" — because all the GSO PD officers involved were allegedly acting as federal agents. The City's motion, therefore, is more properly made on summary judgment, after discovery and based on a more fully developed record. Accordingly, the City's motion to dismiss the section 1983 claim for want of subject matter and personal jurisdiction based on derivative sovereign and prosecutorial immunities is DENIED, without prejudice to its being raised on summary judgment.

### D.    Punitive Damages

The City also moves to dismiss Plaintiffs' claims for punitive damages appearing in the prayer for relief, pursuant to Rule 12(b)(6).[35]  (Doc. 9 ¶ 6; Doc. 10 at 19-20; Doc. 15 ¶ 3 n.1; Doc. 21 at 17-18.)  At oral argument, Plaintiffs acknowledged that they intended to remove all claims for punitive damages when filing the Amended Complaint and failed to do so only by oversight; thus, Plaintiffs stipulated that the pleadings were deemed to be amended to remove the claim for punitive damages in the prayer for relief. (Tr. of Oral Argument at 59.)  In light of Plaintiffs' statement at oral argument withdrawing all punitive damages claims, the City's

---

[35]  In the Complaint, Plaintiffs requested punitive damages in the third claim (negligence) and in the prayer for relief.  (Doc. 4 ¶ 46, prayer for relief ¶ 2.)  Although Plaintiffs subsequently deleted the reference to punitive damages in paragraph 46 of the Amended Complaint, the prayer for relief still includes a request for such damages.  (Doc. 12 at 9 ¶ 2.)  Plaintiffs offer no rationale for retaining the request for punitive damages in the Amended Complaint.  (Tr. of Oral Argument at 59.)

motion to dismiss all such damages claims is moot, and all punitive damages claims are hereby deemed withdrawn from the case.

### E.  Remaining Motions

The City moves the court for an *in camera* review of the audiotape recordings from which the excerpts in the Flinchum, Holder and Hastings affidavits were quoted.  (Doc. 22.)  The City acknowledged at oral argument that the motion was offered only if the court declined to consider the information in the affidavits, and the City represented that the relevant portions of the recordings for which it would seek *in camera* review were already contained in the affidavits.  (Tr. of Oral Argument at 50, 51.)  In other words, the affidavits are sufficient evidence without an *in camera* review of the recordings.  (<u>Id.</u>)  Because the court has ruled that the City's Motion to Dismiss fails even if the materials quoted from the audiotapes were admissible at this stage, the City's motion is DENIED, without prejudice.

The City also moves for a stay of proceedings if Plaintiffs' Motion to Strike the Flinchum, Hastings or Holder affidavits is granted.  (Doc. 23.)  Because the court finds that the City's various motions predicted upon its argument of derivative federal sovereign and prosecutorial immunities should be denied at this stage of the case even considering all the City's proffered

66

including inadmissible) evidence, the City's Motion to Stay is DENIED.

## III. CONCLUSION

For the reasons set forth above, IT IS ORDERED AND ADJUDGED that:

1.  The City's Motion and Renewed Motion to Dismiss the Complaint for failure to join required and indispensable parties pursuant to Rules 19 and 12(b)(7), Fed. R. Civ. P., (Docs. 9 & 15) are DENIED, WITHOUT PREJUDICE;

2.  The City's Motion and Renewed Motion to Dismiss Plaintiffs' claim under 42 U.S.C. § 1983 for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P., (Docs. 9 & 15) is DENIED;

3.  The City's Motion and Renewed Motion to Dismiss Plaintiffs' claim under 42 U.S.C. § 1983 for lack of subject matter jurisdiction and lack of personal jurisdiction pursuant to Rules 12(b)(1) and 12(b)(2), Fed. R. Civ. P., based on claims of derivative federal sovereign immunity (Docs. 9 & 15), are DENIED, WITHOUT PREJUDICE to being raised on summary judgment;

4.  The City's Motion and Renewed Motion to Dismiss the negligence claims pursuant to Rule 12(b)(1), Fed. R. Civ.

67

P., based on its governmental sovereign immunity (Docs. 9 & 15), are GRANTED;

5.  The City's Motion and Renewed Motion to Dismiss all claims of punitive damages for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P., (Docs. 9 & 15) are rendered moot by Plaintiffs withdrawal of all such claims at oral argument, and thus all claims of punitive damages are deemed withdrawn from the Amended Complaint;

6.  The Plaintiffs' Motion to Strike the Affidavit of Flinchum (Doc. 14) is DENIED;

7.  The Plaintiffs' Motion to Strike the Affidavits of Hastings and Holder (Doc. 25) is DENIED;

8.  The City's Motion for In Camera Review in support of its Motion and Renewed Motion to Dismiss (Doc. 22) is DENIED, WITHOUT PREJUDICE;

9.  The City's Conditional Motion to Stay (Doc. 23) is DENIED, WITHOUT PREJUDICE.


                                    /s/ Thomas D. Schroeder
                                    United States District Judge


Dated:  May 30, 2008